# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

| | | |
|---|---|---|
| KAREN ANDERSON | ) | |
| | ) | |
| | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 6:16-CV-2038-KOB |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On May 29, 2013, the claimant protectively applied for disability and

disability insurance benefits under Title II of the Social Security Act.  The claimant

alleged disability beginning March 18, 2013, because of arthritis in her left leg, hip

pain, restless leg syndrome, migraine headaches, depression, anxiety, carpel tunnel

syndrome, anemia, high cholesterol, and acid reflux.  The Commissioner denied

these claims on August 21, 2013. (R. 70-76, 124-29, 163-70). On September 19,

2013, the claimant filed a written request for a hearing before an Administrative Law Judge, and he held a video hearing on April 27, 2015. (R. 8-39).

In a decision dated July 7, 2015, the ALJ found the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for disability benefits. (R. 51-67). On October 24, 2016, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 3-5). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the court REVERSES and REMANDS the decision of the ALJ because substantial evidence does not support his residual functional capacity (RFC) determination.

## II. ISSUE PRESENTED

Whether the ALJ's RFC determination that the claimant can perform work at the medium exertion level lacks substantial evidence because he improperly discounted the limiting effects of the claimant's migraine headaches.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g);

*Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims.*" Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to

disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The responsibility for determining the claimant's RFC rests with the ALJ. 20 C.F.R. §§ 404.1546(c), 416.946(c). An RFC assessment involves consideration of all relevant evidence in determining the claimant's ability to do work in spite of her impairments. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).

The ALJ determines the claimant's RFC only after establishing the extent of the claimant's severe impairments. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).  In evaluating pain and other subjective complaints in making his RFC determination, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* (1) objective medical evidence that confirms the

severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

If the ALJ decides to discredit the claimant's testimony regarding the intensity and limiting effects of her severe impairments, he must articulate explicit and adequate reasons for that decision. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). If substantial evidence does not support the ALJ's findings regarding the limiting effects of her severe impairments, the ALJ commits reversible error. *Foote*, 67 F.3d at 1562.

## V. FACTS

The claimant was sixty years old at the time of the ALJ's final decision. The claimant has a 12th grade education and past relevant work as a trucking detailer and in a composite job involving clerical work, dispatching, delivering, and cleaning. (R. 165). The claimant alleged disability beginning on March 18, 2013 because of arthritis in her left leg, hip pain, restless leg syndrome, migraine headaches, depression, anxiety, carpel tunnel syndrome, anemia, high cholesterol, and acid reflux. (R. 164).

*Physical Limitations*

On September 16, 2008, the claimant sought treatment at the Hope Clinic in Jasper for a migraine, and the doctor prescribed Maxalt.[1] From February 3, 2009 through February 28, 2012, the claimant sought treatment on approximately seven occasions at the Hope Clinic for her migraine headaches. Although she was still waking up with migraines, she reported in June and December 2010 that the Maxalt was working. In August 2011, she complained that she had a burning sensation in the right side of her head and then developed a migraine. (R. 251-261).

The claimant also sought treatment for her back, leg, and joint pain at the Hope Clinic beginning in November 2006. The record contains no medical reports regarding the claimant's back or joint pain again until February 3, 2009, when she complained to a doctor at the Hope Clinic about her arthritis and tingling pain in her left arm and shin. On June 9, 2009, she complained that her legs hurt, tingled, and cramped at night, and the doctor at the Hope Clinic suspected restless leg syndrome and prescribed Requip. (R. 259, 260, 269).

Between October 26, 2009 and July 26, 2010, the claimant sought treatment with Dr. Morton Goldfarb at ENT Associates of Alabama on four occasions for chronic external otitis and acute exacerbation in her right ear. The claimant complained of headaches, dizziness, vomiting, and feeling "off balance."

---

[1] For each record from the Hope Center, the name of the treating doctor is illegible.

Audiograms revealed "rather significant loss in the high frequencies" and "significant nerve loss." At the July 26 visit, Dr. Goldfarb noted that the claimant was on Prozac for depression and anxiety, Methacarbonol for arthritis, Mobic for pain and inflammation, and Crestor for balance. Dr. Goldfarb ordered a brain CT with contrast, but the record does not contain results of that CT scan. (R. 239-242).

The claimant's next documented complaint at the Hope Clinic on December 16, 2010 involved her left hip and leg tingling "all the time." A doctor at the Hope Clinic prescribed the claimant Neurontin for the tingling in her lower extremities. On the claimant's next visit to Hope Clinic on February 28, 2012, she complained of a burning sensation in her neck at night. A doctor at the Hope Clinic assessed the tingling as neuropathy, and continued the claimant on Neurontin. By her follow-up on June 26, 2012, the claimant indicated that she had "no complaints." (R. 251, 253-54).

On April 23, 2013, the claimant complained of tingling in her left arm from the elbow down to her fingertips. The doctor at Hope Clinic suspected "possible carpel tunnel" syndrome and prescribed a wrist splint. (R. 294).

The claimant completed a "Function Report-Adult" on June 24, 2013 at the request of the Social Security Administration. In that report, she stated that she lives with her husband Royce Anderson and starts her day by straightening up her

house, but she has to sit several times because her feet and legs start to hurt. She cleans and sweeps the house about one hour a day. She does a little laundry; watches television; cooks supper; cleans the kitchen; watches television again; and then goes to bed. She takes care of her husband by cooking for him and making sure he takes his medications. Her husband walks the dog because she cannot walk "a long distance." Her restless leg syndrome makes her legs ache constantly. (R. 184-86).

The claimant drives and goes out "several times a day." She grocery shops with her husband twice a week for about one hour. She reads; watches television about four hours a day but has to get up and walk around because her legs ache; swims; works in the flower bed "some"; visits with her children and grandchildren weekly; visits friends once a week. (R. 187-88).

She cannot walk or sit for long and cannot use her hands a lot because she gets cramps in them. She stated that she can lift 15 pounds; cannot stand or walk too long because her feet and legs hurt; can walk "about ½ a football field" before she has to stop and rest for about fifteen minutes; has no problem paying attention, following written or spoken instructions, or getting along with authority figures; does not handle stress very well; and can handle changes in routine well. (R. 189-91).

The claimant's husband completed a "Function Report-Adult-Third Party" on June 25, 2013. He stated that he helps the claimant up and down stairs, but she feeds and "takes care of [him]." He said he "helps [the claimant] do everything in her daily routine," but marked on the form that the claimant has "NO PROBLEM" with her personal care. Mr. Anderson noted that the claimant cleans the house "all day depending on how she feels"; washes clothes; goes outside three to four times a day; grocery shops once a week for about thirty minutes to one hour; can pay bills, count change, handle a savings account, and use a checkbook; watches television about one hour and has to move around because her legs hurt; visits her grandchildren, sister, and mother every week; and needs someone with her in case she falls.

Mr. Anderson indicated that the claimant can walk across the house before she has to stop and rest; does well with other people; does not handle stress well; cannot handle changes in her routine; is afraid to walk without someone with her at all times in case she falls; and wears a brace on her wrist. He said he feels sorry for his wife because she used to help him get around, but now needs help herself because of her arthritis and restless leg syndrome. (R. 192-99).

The clamant returned to the Hope Clinic on July 11, 2013 complaining of cramps in her legs, pain in her feet, and tingling in her hands and arms. She reported that the wrist splint improved her carpel tunnel by about "50%." The

doctor at the Hope Clinic continued the claimant on her current course of treatment. (R. 293).

Dr. Johnathan Ledet evaluated the claimant on July 13, 2013 at the request of the Disability Determination Service. Dr. Ledet reviewed all of the claimant's medical records and physically examined her. The claimant told Dr. Ledet that she has "severe depression"; has difficulty interacting with others at times; has difficulty walking or standing for long periods of time because of her restless leg syndrome; can stand for about 15-20 minutes at a time and for two hours in an eight-hour day on and off with breaks; can walk approximately 100 yards; cannot sit for long periods of time without pain; can sit for approximately 45 minutes at a time; can drive for an hour and a half at a time; has carpal tunnel in both hands, with decreased strength in her right hand; can lift 20 pounds; has balance issues and frequently falls; can sweep, mop, vacuum, cook, do dishes, and shop; and has approximately two severe cluster headaches a week that are incapacitating but relieved by Tylenol, Maxalt, and rest. (R. 272-73).

Dr. Ledet's physical examination of the claimant revealed that she had no difficulty getting on and off the examination table and could sit in and rise from a chair with no problems. He noted the claimant's arthritis in her feet; stiffness in her legs; normal gait; full range of motion in all of her joints; negative straight leg test; ability to walk on heels and toes; ability to squat and rise from a squatted

position with no difficulty; decreased grip strength of 4/5 in her right hand and normal 5/5 grip strength in her left hand; and normal neurological findings and sensation in her muscles and tendons. (R. 274-77).

The claimant completed a "Headache Questionnaire" on August 12, 2013 at the request of the Disability Determination Service. She indicated that she has a headache at least four times a week, but has a severe headache twice a week. Most of the time, she wakes up with a headache that lasts about four to five hours. Her headaches make her sick to her stomach, and she usually has to go to bed in a dark, quiet room. Sometimes her prescription for Maxalt along with Advil helps, but sometimes nothing helps. She experiences nausea sometimes after taking her headache medications. She sometimes has to go to the AfterHours Clinic to get a shot to help relieve her headaches; the last time she needed a shot was a year prior. She tries to get over the headaches by herself because the shots make her sleepy and cause her to be in the bed for several days. Sometimes her headaches affect her balance. (R. 201-03).

On August 20, 2013, Dr. Gloria L. Sellman reviewed the claimant's records at the request of the Disability Determination Service, but did not personally examine the claimant. Dr. Sellman opined that the claimant could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk with normal breaks for a total of six hours in an eight-hour workday; push and/or

pull hand and foot controls in an unlimited fashion; occasionally climb ramps and stairs; never claim ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl.

In making her physical capacity assessment of the claimant, Dr. Sellman noted that the record contains no objective findings to support the claimant's allegations that she has imbalance issues and falls. Although she noted the claimant's migraine headaches, Dr. Sellman noted that the claimant did not take any prophylactic medications for her headaches; had "good results" with the Maxalt prescription; and did not seek neurological treatment for her migraines. Dr. Sellman also referenced Dr. Ledet's objective findings that the claimant had full range of motion in all of her joints and normal strength throughout her body, except in her right hand grip at 4/5. (R. 46-49).

The claimant returned to the Hope Clinic on October 15, 2013 for a follow-up complaining of leg cramps and a burning sensation in her feet at night. The doctor at Hope Clinic did not change any of her medications. (R. 292).

On January 8, 2014, the claimant presented to the AfterHours Clinic in Jasper complaining of a migraine headache that she had for four days. The notes for that visit state "has 1-2/year." The attending physician gave the claimant shots of Bupap and Phenergan for her migraine, and she was in bed for several days after that visit. The next month, on February 25, 2014, the claimant complained to a

doctor at the Hope Clinic that the Maxalt did not help her migraines.  At that visit, she also complained of low back and left hip pain; the doctor noted the need for a x-ray and MRI of her left hip.  (R. 291, 302).

The claimant saw Dr. Goldfarb on June 4, 2014 for ear issues she had several years before. She complained about ear pain and drainage; imbalance issues causing her to fall down; headaches; tingling in her lips, hands, and feet; joint pain; and depression.  Dr. Goldfarb diagnosed her with acute bilateral otitis externa and prescribed drops and a steroid to help with her ear pain.  (R. 286-87).

The claimant returned to the Hope Clinic on July 3, 2014 reporting leg, back, and hip pain that was "getting worse" and knots on her wrist that caused her hand to "lock up."  The record for that visit lists the claimant's medications as 500 mg Robaxin as a muscle relaxer; 250 mg Depakote used to treat anxiety and migraines; Prozac for depression and anxiety; 25 mg Antivert to treat nausea and dizziness; 10 mg Maxalt for her migraines; 10 mg Crestor for balance; 25 mg Phenergan for nausea; Ropinirole for her restless leg syndrome; 15 mg Mobic for inflammation; and 300 mg Neurontin for her nerve pain.  (R. 290).

When the claimant returned to Dr. Goldfarb on August 26, 2014 for a follow-up for her ears, she reported "general good health lately" and denied joint pain, depression, and tingling in her feet or hands.  (R. 278-79).  But two months

later on October 8, 2014, she reported to the doctor at the Hope Center that her balance was off.  (R. 289).

She returned to the Hope Clinic on January 14, 2015 complaining of a severe headache for two days with no relief with her prescription medications. Three days later, she presented to the AfterHours Clinic complaining that she still had the migraine with nausea from days before.  Dr. Pruett gave the claimant a shot of 2 mg Stadol and 50 mg Phenergan to help alleviate her pain and nausea.  Two days after that visit, the claimant went to Walker Baptist Medical Center complaining of that same migraine getting worse. The record from Walker Baptist is unclear as to whether Dr. Jarvis Patton gave the claimant any additional medications or shots for this migraine.  (R. 288, 301, 304-11).

*ALJ Hearing*

After the Commissioner denied the claimant's request for disability benefits, the claimant requested and received a hearing before an ALJ on April 27, 2015. (R. 8-39).  The claimant testified that she stopped working because she could not sit very long in a job where she was "running parts and stuff" and could not carry the parts because of her pain.  She worked for her employer for about twenty years; her employer "cut her some slack the last couple of years of her work," and was very good to her, "but then [she] just couldn't do it anymore."  She tried to find

another job, but her pain required her to sit a while and then stand a while and no one would want to hire her with those limitations.  (R. 21-22).

The claimant testified that she has degenerative osteoarthritis in her left hip and leg that causes constant severe pain and problems walking. She loses her balance because her leg feels like its "going to buckle from under [her]," and she has fallen several times.  She does not use a cane or crutch.  (R. 15).

When she goes to the grocery store with her husband, he holds onto her when she walks around.  She testified that she can drive sometimes but someone is always with her; can climb stairs if she leads with her right foot and holds on to the railing; can carry something ten pounds or less when walking upstairs; can walk "pretty good on uneven ground" but has "fallen walking on uneven ground"; and hurts when walking up inclines.  (R. 16-17).

She takes Ropinirol for her leg cramps and Celebrex, but neither medication helps with her pain.  She has a "constant nag" that affects her sleeping.  Her legs feel like they are constantly moving at night, and, although she sleeps with a pillow under her left leg, she cannot get comfortable at night.  (R. 17-18).

Regarding her migraine headaches, she stated she has a really severe one about once a month, and some months she has them really bad.  When one hits, they last usually around two days, but sometimes longer.  When one of her really severe migraines hits, sometimes it takes several days to fully get rid of the

headache.  She has to go to her room; shut the blinds; turn off the lights; and lay in the dark.  She takes Maxalt that helps her migraines "sometimes."  She testified that sometimes she gets "deathly sick" from the headaches and has to go the hospital or a doctor for a shot of medication; her last headache that severe was in January 2015 when she was "deathly sick" for four-and-a-half days of the seven day headache.  (R. 19-20).

Her typical day involves trying to get up and "do stuff," but she has to do everything in moderation.  She folds laundry but her husband carries the baskets because she is afraid she will fall.  She walks around a little; sits down for a little while and watches TV; props up her leg while she sits in the recliner; and gets up again to move around a little.  During an eight or nine hour day, she sits in the recliner a total of about four-and-a-half to five hours.  "That's basically what [she does] all day."  She testified that she can cook, but she has to lean up against the stove while she stands to cook; sit down at the bar while the food cooks; and get up to finish cooking.  (R. 18-19, 25).

The claimant indicated that she helps take care of her husband, who is disabled from severe back problems and a heart attack in 2003.  She cooks for her husband and makes sure he takes his medications. Every four to six months, they take weekend camping trips in their friend's motor home and "just sit around the

campground and talk and laugh." She and her husband also sometimes ride with her friends to fish in Tennessee. (R. 23-26).

The claimant testified that she sees her grandkids about five times a week; she walks to her son's house about four houses down the street to visit at least once a week. She goes to their activities, like ball games and beauty pageants, but has had to miss some because "she wasn't feeling good at the time." She also sometimes sits on a blanket and pulls weeds out of the flowerbed. (R. 26-28).

Regarding her work history, the vocational expert Dr. Dallas Russell testified that the claimant previously worked from 1999 until January 2003 as a detailer, classified as medium and unskilled work. Dr. Russell stated that from January 2003 through March 2013 when the claimant stopped working, she "only worked part-time, 20 hours a week in a composite job that had four components." That composite job included work as a clerical worker, classified as light and semi-skilled; a dispatcher, classified as sedentary and skilled; a merchandise deliverer, classified as medium but performed as light and unskilled; and a cleaner, classified as heavy but performed as light and unskilled. (R. 29, 38-40).

Dr. Russell then testified concerning the type and availability of jobs that the claimant was able to perform. Dr. Russell stated that a hypothetical person the same age, education, and work history as the claimant, who could perform medium work, could perform the claimant's past relevant work at the composite job that

involved work as a clerk, dispatcher, merchandise deliverer, and cleaner. However, he testified that such a hypothetical individual could not perform the claimant's past relevant work as a detailer.  Dr. Russell also testified that alternative medium-exertion work was available for such an individual, including work as a hand packager, with 3000 positions available in the state and 248,000 positions available nationally; box maker, with 1,200 positions available in the state and 86,000 positions available nationally; and machine tender, with 2,100 positions available in the state and 184,000 positions available nationally.  (R. 33-34).

The ALJ then asked Dr. Russell about the impact that migraine headaches could have on the hypothetical individual's ability to work in a medium exertion, unskilled job.  Dr. Russell testified that unskilled workers are expected to work two-hour periods at a time in an eight-hour workday with custom breaks; a person who must be off-task more than nine minutes per hour cannot sustain employment; and employers would not tolerate an employee missing more than two days a month.  Dr. Russell also testified that no jobs would be available for someone who had to prop up her feet at waist level or above for half of a workday.  (R. 34-36).

## VI. ALJ OPINION

On July 7, 2015, the ALJ determined that the claimant was not disabled under the Social Security Act. The ALJ found the claimant met the insured status

requirement of the Social Security Act through December 31, 2017 and had not engaged in substantial gainful activity since March 18, 2013, the alleged onset date of disability. (R. 56).

Next, the ALJ found that the claimant suffered from the severe impairments of migraine headaches, back pain/lumbar radiculopathy, and osteoarthritis. Regarding her gastroesophageal reflux disease, hearing loss, and carpel tunnel syndrome, the ALJ found those impairments non-severe because they caused no more than a minimal functional limitation, if any, on the claimant's ability to perform work-related activities.

The ALJ also found the claimant's generalized anxiety disorder and depression non-severe because the claimant takes medications as prescribed to control her symptoms; she did not allege at the hearing that these impairments keep her from working; and they cause no more than a mild limitation in her activities of daily living, social functioning, concentration, persistence, and pace. In making his finding regarding her mental limitations, the ALJ noted that the claimant is independent in her personal care and grooming; can drive a car; cooks meals; goes grocery shopping with her husband weekly; does household chores like cleaning and laundry; takes walks to visit her family down the street on a weekly basis; attends sporting events to see her grandchildren play; gets along well with authority figures; has never been fired from a job for not getting along with others;

is socially active with her family about five times a week; has a good attention span; can follow directions well; enjoys reading and watching television; and has had no episodes of decompensation.  (R. 56-58).

The ALJ next found that none of the claimant's impairments, singly or in combination, manifested the specific signs and diagnostic findings required by the Listing of Impairments.  He noted that the evidence of record does not contain any "diagnostic findings, signs, symptoms, or laboratory results" or medical opinions to support that the claimant meets a Listing.  (R. 58-59).

The ALJ then determined that the claimant had the RFC to perform medium work, except that she can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can frequently balance, stoop, kneel, crouch, and crawl; cannot be exposed to extreme cold, heat, or wetness; and can have occasional exposure to hazardous machinery, unprotected heights, and uneven terrain.  In making this RFC determination, the ALJ indicated he carefully considered the entire record and recounted parts of the record to supports his finding.  (R. 59).

In considering the claimant's subjective allegations of pain, the ALJ applied the controlling pain standard of the Eleventh Circuit and found that the claimant's allegations of pain were not fully credible when considered in light of the entire record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's

allegations regarding intensity, persistence, and limiting effects of these symptoms were "not entirely credible." (R. 59).

He noted that the claimant stated at the hearing that she could not work because of her "pain in her legs and back, as well as her migraine headaches." Regarding her leg and back pain, the ALJ acknowledged that the objective record showed that the claimant had pain in her lower back and left leg, but noted that doctors only prescribed muscle relaxers and non-narcotic anti-inflammatory medication for those impairments. The ALJ also acknowledged the objective evidence of record regarding her migraine headache complaints, but noted that the claimant reported that the prescription for Maxalt controlled her migraines; that she had only been to the AfterHours Clinic twice in January 2014 and January 2015 for her headaches; and that she reported in January 2014 that she only had migraines "one to two times a year." (R. 60).

In assessing the claimant's daily activities as they relate to her complaints of disabling pain, the ALJ noted that she can care for herself; can drive a car, goes grocery shopping; does household chores; cares for her disabled husband; sees her grandchildren several times a week; attends her grandchildren's activities; and travels with her husband in a camper on some weekends. He found that these activities are inconsistent with someone who has disabling pain. The ALJ considered the Third Party Function Report by the claimant's husband and gave it

"some weight," but found that the claimant's treatment records did not support the level of severity he alleged for the claimant's limitations. (R. 60-61).

The ALJ gave examining consultant Dr. Ledet's opinion great weight because "he performed a comprehensive examination of the claimant and his findings are consistent with his opinions." He also gave consulting physician Dr. Sellman great weight because her opinion is consistent with the medical records and with Dr. Ledet's opinion. (R. 61).

Lastly, the ALJ found that the claimant could not perform any past relevant work, citing that the "vocational expert testified that the claimant, with the residual functional capacity [assessed by the ALJ] would not be able to perform any of her past relevant work as classified."[2] However, the ALJ found that the claimant could perform other medium exertion work that exists in significant numbers in the national economy. Based on the vocational expert's testimony, the ALJ found that the claimant could perform representative occupations including a hand packager, box maker, and machine tender. Thus, the ALJ concluded that the claimant was not disabled as defined by the Social Security Act. (R. 62-63).

VII. DISCUSSION

---

[2]  The ALJ incorrectly stated that Dr. Russell testified that the claimant could not perform any of her past relevant work.  Instead, Dr. Russell indicated that the claimant could not perform her past relevant work as a detailer, but could work at the composite job involving clerical work, dispatching, merchandise delivering, and cleaning if she is able to drive.  (R. 33).

The claimant argues that the ALJ's RFC determination that the claimant could do medium exertion work on a full-time basis lacks substantial evidence to support it. This court agrees.

The ALJ found that the claimant suffers from the severe impairment of migraine headaches. In making his RFC determination, the ALJ must consider the extent that the claimant's migraine headaches affect her ability to work full-time. *See Lewis*, 125 F.3d 1440 (the ALJ must assess the claimant's ability to work full-time in spite of her impairments and must consider all relevant evidence in making that assessment).

In determining the claimant's RFC, the ALJ applied the pain standard to evaluate the claimant's subjective statements regarding the limiting effects of her migraine headaches. The ALJ found that her migraines could reasonably be expected to cause the claimant's symptoms, but the claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms were "not entirely credible." The ALJ's reasons, however, for discrediting the limiting effects of the claimant's migraines lack substantial evidence. *See Foote*, 67 F.3d at 1562 (substantial evidence must support the ALJ's reasons for discrediting the limiting effects of a claimant's severe impairment).

The ALJ improperly disregarded any limiting effects of the claimant's migraine headaches in making his RFC determination. In discounting the

claimant's migraine headaches, the ALJ stated that the claimant reported to a Hope

Center doctor that her prescription medication Maxalt controls her migraines.

Although the claimant stated in *2010* that the Maxalt helped her migraines, the

ALJ ignored the claimant's headache questionnaire in August 2013 that sometimes

her Maxalt does not help her migraines and her report to the Hope Clinic doctor in

February 2014 that Maxalt was not helping her migraines.  The claimant's

indication on a few occasions in 2010 that Maxalt helped her migraines is not

inconsistent with her statements in 2013 and 2015 regarding the frequency and

severity of her migraine headaches.

The ALJ acknowledged that the claimant sought treatment at the AfterHours

Clinic for extremely severe migraine headaches in January 2014 and January 2015.

But as grounds for discounting the claimant's subjective statements regarding the

limiting effects of her migraines in performing full-time work, the ALJ stated that

the claimant reported in January 2014 that "she had migraine headaches one to two

times a year."  However, given the claimant's headache questionnaire in 2013 and

her hearing testimony in 2015, the ALJ seems to mischaracterize the claimant's

statement to the Hope Clinic doctor in January 2014.

The claimant consistently maintained in 2013 and 2015 that she has a severe

headache about twice a week; a really severe migraine about once a month but

some months are worse; and that sometimes she gets "deathly sick" and has to go

to the AfterHours Clinic to get a shot. On that January 2014 doctor's visit, the claimant reported that she had that migraine for four days before she went to the clinic seeking relief from that severe migraine. The doctor's notation in that January 2014 record indicating "has 1-2/year" could refer to those migraines that sometimes make her "deathly sick" and last for days and is not necessarily inconsistent with the number of severe migraines the claimant consistently stated she experiences each week and month. The fact that the claimant only goes to the AfterHours Clinic for shots when her migraines make her "deathly sick" and last for days does not negate that the claimant has debilitating headaches that could cause her to miss more than two days a month and affect her ability to sustain full-time work.

The court finds that, in making his RFC determination, the ALJ's reasons for discounting the claimant's subjective statements regarding the intensity and limiting effects of her migraine headaches are not supported by substantial evidence.

*Other Concerns*

The court is also concerned whether substantial evidence supports the ALJ's RFC determination that the claimant could perform *medium* exertion work on a

full-time basis. The vocation expert Dr. Russell testified at the hearing that the claimant only worked *part-time* at the composite job from January 2003 until March 2013 when the claimant stopped working allegedly because of her severe impairments. (R. 29). That composite job included work at the sedentary and light level. Although the merchandise deliverer job was a medium exertion job, Dr. Russell testified that the claimant performed that job part-time at the light exertion level. Given that Dr. Russell found that the claimant could not return to her full-time job as a detailer at the medium exertion level and she worked for ten years only part-time at sedentary and light work, the court questions how the claimant could function full-time at medium exertion work in light of her severe impairments. Also, the claimant told Dr. Ledet and testified at the hearing that she could lift 15-20 pounds, but Dr. Sellman, after only reviewing the claimant's medical records, assessed that the claimant could lift *50 pounds* occasionally to do medium exertion work. The court finds nothing on which Dr. Sellman based that lifting finding.

Dr. Ledet did not assess the claimant's residual functional capacity, and the results of his physical examination were not inconsistent with the claimant's statements regarding the pain she experienced because of her impairments. The fact that she can get on and off an exam table, squat on one occasion, and had full range of motion in her joints on that one date does not negate the years the

claimant consistently complained to doctors at the Hope Center about her leg and hip pain and migraine headaches.

The court is also concerned that the ALJ failed to include any type of sit-stand option in his hypothetical to Dr. Russell. The objective medical record supports that the claimant has restless leg syndrome and osteoarthritis and takes prescription medications for these conditions. The record supports that the claimant cannot stand or sit for long periods of time because of her conditions and on remand the ALJ should consider a sit-stand option in his hypothetical to the vocational expert.

The court also questions the ALJ's finding that the claimant's daily activities negate her subjective statements about the limiting effects caused by her hip and leg pain and her migraine headaches. The facts that the claimant can care for her personal hygiene, drive a car sometimes, go shopping occasionally, and cook while she leans up against the stove and sits down while the meal cooks do not mean that she can sustain full-time employment. Even a disabled person can take a trip every four to six months in a RV to sit around and talk with her friends. The claimant does not have to be an invalid who does absolutely nothing and never leaves her home to be disabled and unable to work full-time. *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986) (substantial evidence did not support the ALJ's finding that the claimant's ability to do simple household chores negated her

claims that she had to lie down every two hours because of her impairments);

*Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981) ("[S]tatutory disability

does not mean that a claimant must be a quadriplegic or an amputee. . . . Disability

does not mean that a claimant must vegetate in a dark room excluded from all

forms of human and social activity. . . . It is well settled that sporadic or transitory

activity does not disprove disability.") (citations and quotations omitted.)

On remand, the ALJ should specifically discuss how the claimant's activities

are *inconsistent* with the limitations she alleges because of her severe impairments,

including her migraines.

## VIII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence

does not support the ALJ's RFC finding that the claimant can perform medium

exertion work on a full-time basis.  Therefore, the court REVERSES and

REMANDS the decision of the ALJ consistent with this Memorandum Opinion.

The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 20th day of March, 2018.


**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE